UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
_____

DAVID J. SPIVA,

        Plaintiff,

v.                                                        Case No. 09-CV-178

MICHAEL J. ASTRUE,
Commissioner of Social Security,

        Defendant.

_____

# ORDER

Plaintiff David Spiva ("Spiva") filed this action for judicial review of the final decision of the Commissioner of Social Security denying his application for benefits. Spiva alleges disability arising from his depression, schizophrenia, insomnia, attention deficit disorder (ADD) and dyslexia. For the reasons set forth below, the court finds that the decision of the Commissioner is supported by substantial evidence and will affirm the decision.

## BACKGROUND

**I.    Procedural Background**

Spiva filed for Social Security Disability Insurance Benefits (DIB) and Supplemental Security Income (SSI) benefits on January 5, 2005, alleging a disability onset date of October 1, 2004. (Tr. 242). The Commissioner denied his initial application and upon reconsideration and Spiva requested a hearing. (Tr. 56-57, 63, 66-70). The agency scheduled a hearing and Spiva appeared before Administrative Law Judge (ALJ) Margaret O'Grady on August 22, 2007, and

represented himself at the proceeding. (Tr. 286, 289). The ALJ denied Spiva's application for DBI and SSI benefits in a written decision on January 14, 2008. The Appeals Council denied review of the decision and Spiva filed suit in this court on February 20, 2009. (Tr. 7).

## II. Factual Background and Hearing Testimony

Spiva's hearing before the ALJ was brief because he was the only testifying witness and he was unrepresented by counsel. (Tr. 288-312). Spiva testified that he was 31 years old that he had moved from Wisconsin to Mississippi in 2002, and then moved back to Wisconsin in 2006 to help support his nine year-old daughter. (Tr. 223, 293, 307). Spiva reported that he had initially lived with his daughter's mother after moving back to Wisconsin, but relationship problems had caused him to leave and move in with his cousin. (Tr. 293, 307-08). Spiva testified that he watched his daughter full-time while her mother was at work and spent the rest of his time listening to music, reading the bible, praying, and occasionally exercising. (Tr. 301-02, 308). He reported sleeping 12 hours per day and occasionally drinking alcohol and using marijuana. (Tr. 306). Spiva stated that he attends to his own personal care and meals and completes some household chores. (Tr. 302).

Spiva has a High School Equivalency Diploma and completed one year of classes at Milwaukee Area Technical College. (Tr. 144, 254-59, 293). He was previously employed at Walmart from 2003 to 2005, where he stocked shelves and loaded trucks and made approximately 14 dollars an hour. (Tr. 294-95). Spiva went

on medical leave from Walmart and never resumed working. (Id.). Spiva's last employment prior to his hearing was janitorial work he did for a daycare. He worked at this position three to four hours per day, five days a week over the course of several months, until the daycare closed in June 2007. (Tr. 294).

Spiva testified that his mental issues were getting worse over time and that he wanted to obtain disability benefits so he could get back on medication and avoid homelessness. (Tr. 309). He testified to having sleeping problems, negative thoughts, irritability, and negative memories from his childhood that he did not know how to deal with. Spiva noted that he had attempted suicide at the age of 14. (Tr. 303). Spiva also stated that he did not like being around others, he felt as though he were "cursed," and he suspected that people wanted to kill him. (Tr. 305, 309). At the time of his hearing, Spiva was taking prescriptions for Depakote, Benadryl, Risperdal and Restoril for his ADD, sleep problems, and other issues. (Tr. 299-300, 304).

### III. Medical Evidence of Record

Spiva's relevant medical history begins on April 23, 2004, when he admitted himself to the Pine Grove Recovery Center ("Pine Grove") in Mississippi. (Tr. 71, 80). Spiva stayed for three days and was given a provisional diagnosis of psychotic disorder not otherwise specified (NOS), mood disorder NOS, alcohol and cannabis abuse, and possible personality disorder. (Tr. 73, 79). He was assigned a Global

-3-

Assessment of Functioning[1] (GAF) score of 40 at admission but was not given one at discharge. (Id.).

Spiva voluntarily admitted himself to Pine Grove for a second time five months later and stayed from September 29 to October 4, 2004. (Tr. 87-91). The date of Spiva's alleged onset of disability falls within this period. At the time of his admission, Spiva reported feeling as though "evil spirits" were after him, but stated that his primary complaint was "life." (Tr. 87). Though Spiva had been given the antidepressant Zoloft during his first stay at Pine Grove, he had quit taking it prior to his second admission. (Id.). Spiva's medical records from Pine Grove note that "it is hard to discern whether his thoughts are psychotic in nature." (Tr. 88). However, he was given the antipsychotic medication Abilify and the antidepressant Effexor. (Tr. 88, 90). Spiva's discharge diagnoses included psychosis NOS, depressive disorder, and a GAF score of 40 to 45. (Tr. 90).

Following his discharge, Spiva saw Dr. Shannon Johnson at the South Mississippi Psychiatric Group. (Tr. 114-18). Dr. Johnson substituted the medications Cymbalta and Elavil for Spiva's Effexor and provided him with samples. (Tr. 117). At Spiva's second visit on December 20, 2004, he reported feeling "tired and miserable" and that evil spirits wanted to hurt him. (Tr. 115). Spiva admitted that he stopped taking Cymbalta and Abilify several weeks prior because he was taking

---

[1]The Global Assessment of Functioning scale reports a clinician's assessment of an individual's overall level of functioning. *Craft v. Astrue*, 539 F.3d 668, 676 n.7 (7th Cir. 2008). GAF scores run from 0 to 100 and indicate an increasing ability to function as the numbers get larger. *Ann G. Hirschman, Medical Proof of Social Security Disability* 12-6 (2nd ed. 2008).

-4-

cough medicine. (Id.). Dr. Johnson discontinued these medications and started Spiva on Geodon. (Id.). Spiva returned to see Dr. Johnson on January 19, 2005. She diagnosed Spiva with depression NOS and psychosis NOS and gave him a prognosis of "fair to guarded." (Tr. 140). Dr. Johnson also noted that Spiva "would be able to maintain steady, gainful employment" if he took his medications and kept his appointments with mental health professionals. (Tr. 140A).

Dr. William Osborn, Ph.D., conducted a comprehensive mental status evaluation of Spiva on April 11, 2005, after a referral from Mississippi Disability Determination Services. (Tr. 143). Dr. Osborn reported that he was able to evaluate Spiva's mental status issues, despite the fact that Spiva was "evasive" and refused to provide certain information about his family background, education, work history, prescription medication, substance abuse, social activities or past incarceration. (Tr. 143-45). Spiva denied having hallucinations but alluded to a "force" inside of him encouraging him to do bad things. (Tr. 145). Spiva also reported having used street drugs up until two months prior to the evaluation. (Tr. 146). Dr. Osborn diagnosed Spiva with "some sort of depression but I don't think it is severe." (Id.). He also concluded that Spiva could "perform routine repetitive tasks, interact with co-workers, receive supervision and maintain concentration and attention." (Id.).

Several weeks later, on May 6, 2005, medical consultant Janise Hinson completed a mental functional capacity assessment for Spiva. (Tr. 148). She found Spiva "Not Significantly Limited" in most areas of assessment and "Moderately

Limited" in interacting with the general public, accepting instructions and responding appropriately, getting along with coworkers, and maintaining socially appropriate behavior and responding appropriately to changes. (Tr. 148-49). Hinson concluded that Spiva could "complete a normal work-week without excessive interruptions from psychological symptoms, can interact appropriately with coworkers and supervisors on a limited basis, and can adapt to a work setting." (Tr. 150).

Over the next year and a half, Spiva received no additional treatment and moved back to Wisconsin. On November 10, 2006, he visited the Milwaukee County Behavioral Health Division and reported feeling suicidal and seeking medication. (Tr. 216-33). His differential diagnoses were alcohol abuse, marijuana dependence, and schizophrenia and he was given a GAF low score of 30. (Tr. 222, 232).

Eight months later, on July 4, 2007, Spiva returned to the Milwaukee County Behavioral Health Division and was voluntarily hospitalized for fifteen days after reporting symptoms like overwhelming evil thoughts, explosive anger, and feelings that he would harm himself or others. Spiva was vague and refused to give consent for treaters to talk to his girlfriend or family for collateral information. (Tr. 178). His records note that Spiva was "not being wholly forthcoming/truthful" about his reasons for admission. (Tr. 204A). One of Spiva's treaters opined that conflict with family members was "probably his immediate reason for admission." (Tr. 206). Spiva was diagnosed with depression and personality disorder NOS and given a GAF score of

25 upon admission. (Tr. 188). Spiva was initially ambivalent regarding treatment, but later agreed to take medications. (Tr. 178-79).

The aforementioned medical records were the only objective evidence before the ALJ at the time of Spiva's hearing. However, following the hearing, but prior to issuance of the ALJ's decision, Spiva wrote a letter to the ALJ advising her that he had been seen at Health Care for the Homeless and that he had an upcoming psychological evaluation scheduled. (Tr. 260). When contacted for medical records, Health Care for the Homeless indicated that their providers had never seen Spiva. (Tr. 238-39). Spiva did submit to a psychological evaluation by Dr. Marc O'Brien, Ph.D., on December 27, 2007, after a referral by the Division of Vocational Rehabilitation.[2] (Tr. 11-20). Spiva provided the results of the evaluation to the Appeals Council for review. (Tr. 10). In his evaluation, Dr. O'Brien gave a diagnostic impression of major depressive disorder with psychotic symptoms. (Tr. 18). Dr. O'Brien also stated that Spiva's "disabilities have interfered with his ability to function" and recommended that he receive job skills training and job placement services. (Tr. 19).

## ANALYSIS

The Social Security Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

---

[2]The Division of Vocational Rehabilitation is a division within the Wisconsin Department of Workforce Development that provides employment services and counseling to people with disabilities, arranges services to assist individuals in going to work, and provides training and assistance to employers regarding disability employment issues. *See* https://dwd.wisconsin.gov/dvr/default.htm. (last visited February 25, 2010).

-7-

Case 2:09-cv-00178-JPS   Filed 03/03/10   Page 7 of 18   Document 17

conclusive." 42 U.S.C. § 405(g). The court will uphold an ALJ's decision if it is supported by substantial evidence, which is evidence that a reasonable person would accept as adequate to support the decision. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004); *Jens v. Barnhart*, 347 F.3d 209, 212 (7th Cir. 2003). A decision is supported by substantial evidence if the ALJ identifies supporting evidence in the record and adequately discusses the issues. *Golembiewski v. Barnhart*, 322 F.3d 912, 915 (7th Cir. 2003). The court determines whether the decision is supported by substantial evidence by reviewing the entire record, but cannot substitute its judgment for the ALJ's by reconsidering facts, re-weighing evidence, resolving conflicts in evidence, or deciding questions of credibility. *Jens*, 347 F.3d at 212. The court looks to see whether the ALJ articulated an "accurate and logical bridge from the evidence to the conclusion" which the court can follow. *See Clifford v. Apfel*, 227 F.3d 863, 872 (7th Cir. 2000).

Spiva argues that the ALJ committed legal error in rendering her decision and makes three specific arguments in support. First, Spiva argues that the ALJ failed to properly support and explain her credibility finding. Second, he argues that the ALJ improperly evaluated his Residual Functional Capacity. Finally, Spiva argues that the ALJ did not adequately assess his vocational abilities at step four of the sequential test for determining disability. Spiva asserts that these errors require a remand of the case to the ALJ for a new evaluation of his claims of disability.

-8-

## I.     Credibility Determination

The ALJ determined that Spiva had medically determinable impairments that could produce his alleged symptoms, but that his statements about the limiting effects of the symptoms "are not entirely credible." (Tr. 35). Spiva argues that this credibility determination constitutes legal error because the reasons the ALJ provided for her finding are not supported by the record and complains that the ALJ did not specifically consider certain evidence in her decision. This court disagrees.

An ALJ's credibility determinations are entitled to special deference and will not be disturbed unless "patently wrong." *Diaz v Chater*, 55 F.3d 300, 308 (7th Cir. 1995). A district court's review of an ALJ's credibility determination is highly limited because the court "lacks direct access to the witnesses, lacks the trier's immersion in the case as a whole, and when reviewing decisions by specialized tribunals also lacks the trier's experience with the type of case under review." *Carradine v. Barnhart*, 360 F.3d 751, 753 (7th Cir. 2004). When an ALJ evaluates the credibility of testimony and complaints, there are several factors to consider, including: the absence of an objective medical basis supporting the degree of severity of subjective complaints alleged; the claimant's daily activity; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness, and side effects of medication; and functional restrictions. *Scheck v. Barnhart*, 357 F.3d 697, 703 (7th Cir. 2004)); *see also* SSR 96-7p. After evaluation of these factors, an ALJ may find a claimant's symptoms not credible even where there is a medically determinable

impairment that could reasonably be expected to produce the symptoms the complainant alleges. *See Scheck*, 357 F.3d at 701-03 (7th Cir. 2004)).

The court cannot find the ALJ's credibility determination patently wrong because she considered the relevant factors in assessing the credibility of Spiva's statements about his limitations and symptoms. In reaching her conclusion, the ALJ noted the lack of an objective medical basis for Spiva's claimed limitations on his ability to work because the record lacked evidence of any regular or ongoing treatment for a physical impairment, and included evidence showing that Spiva responded well to treatment and medications for his mental impairments. The ALJ also referenced treatment notes regarding Spiva's malingering and evasiveness when dealing with treating professionals, which undermines his credibility. She further relied upon the fact that Spiva was often off his medications prior to his need for hospitalization or treatment, suggesting that his limitations are related to his decision to stop following prescribed treatment. Finally, the ALJ cites to Spiva's activities and his reported ability to provide primary care for his daughter, his ability to do household chores, and his ability to interact with family members. She reasons that an individual capable of these activities is not so impaired as to be unable to engage in substantial gainful employment.

Given the ALJ's articulated reasons for her credibility findings, Spiva resorts to picking out items from the record and criticizing the ALJ's failure to specifically cite to each one. For instance, Spiva argues that the ALJ erred by not mentioning his

April 2004 hospitalization, by not mentioning his given reasons for going off his medications (lack of funds and cough medicine), by not mentioning that one psychiatrist ruled out malingering, and by not mentioning that a functional report filled out by Spiva's aunt in 2005 noted he needed reminding to do chores and that he did not like being around a lot of people.  However, the ALJ need not do a written evaluation of each piece of evidence and minor omissions do not render an ALJ's credibility finding unsupported by substantial evidence. *See Diaz*, 55 F.3d at 308; *Jens*, 347 F.3d at 214.  The ALJ properly supported her credibility finding and adequately articulated her reasoning.  Therefore, applying the high level of deference appropriate to the ALJ's determination, the court finds no error requiring remand in her credibility finding.

## II.     Residual Functional Capacity Determination

Spiva next alleges that the ALJ's determination of his mental Residual Functional Capacity (RFC) was not supported by substantial evidence because the ALJ did not specifically evaluate how the evidence supported her findings that Spiva did not meet or equal the medical listings the agency deems conclusively disabling. The ALJ found that Spiva had the severe impairments of mood disorder, schizophrenia, dysthymia, psychosis, depression, alcohol and cannabis abuse, and ADD.  She also concluded that Spiva's impairments did not meet or medically equal any of the listed impairments appearing in 20 C.F.R. 404, Subpart P, Appendix 1. In determining whether a claimant is "disabled," the Social Security agency

considers whether the claimant's impairments meet or medically equal one of the specific impairments listed in the aforementioned appendix. If they do, then the claimant is presumptively eligible for benefits. *Barnett v. Barnhart*, 381 F.3d 664, 668 (7th Cir. 2004) (citing 20 C.F.R. § 404.1520(d)). A claimant may establish this presumptive disability by showing his impairment includes symptoms equal in severity to those described in the listing. *Id.*

The ALJ considered the medical listings for 12.03 Schizophrenia, 12.04 Affective Disorders, 12.08 Personality Disorders, and 12.09 Substance Addiction Disorders in her analysis and found that Spiva's impairments did not meet the required criteria for any of the listings. The ALJ stated that she considered the "paragraph B" criteria for each listing and found them unsatisfied. Listings 12.03. 12.04, 12.08, and 12.09 state that a claimant's impairments must satisfy a number of requirements to be conclusively disabling, including the requirements of paragraph "B."[3] Paragraph "B" requires that a claimant have impairments resulting in at least two of the following:

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration.

---

[3]Medical listing 12.09 Substance addiction disorders does not include the paragraph "B" language, but rather, requires that a claimant satisfy the requirements of another listing, including 12.04 or 12.08. 20 C.F.R. P.404, Subpt. P, App. 1, 12.09. Therefore, meeting or equaling 12.09 also requires a claimant to meet the paragraph "B" requirements.

-12-

*See* 20 C.F.R. P. 404, Subpt. P., App. 1, 12.03, 12.04, 12.08, 12.09.  The ALJ determined that Spiva did not meet any two of the requirements because he suffers only mild limitations in activities of daily living, moderate limitations in social functioning, moderate limitations in maintaining concentration, persistence, or pace, and has experienced only one episode of decompensation. (Tr. 33).

Spiva argues that these findings constitute error because the ALJ did not cite to particular evidence supporting her conclusions about the paragraph "B" criteria. However, pointing out omissions is not enough to establish that the ALJ erred in considering whether Spiva met or equaled a listed impairment.  As the claimant, Spiva has the burden of establishing that he meets the criteria specified in the cited listings. *See Riboudo v. Barnhart*, 458 F.3d 580, 583 (7th Cir. 2006).  Spiva argues that the ALJ erred by not specifically mentioning his GAF assessments and his three hospitalizations.  However, Spiva fails to explain how his GAF scores or his hospitalizations meet two of the paragraph "B" requirements.  Thus, he does not establish that the ALJ incorrectly concluded that he did not meet or equal listings 12.03, 12.04, 12.08, or 12.09.

Spiva next argues that the ALJ's RFC determination was not supported by substantial evidence because she failed to assess his mental limitations in terms of work-related functions.  The ALJ found that Spiva had the RFC to perform unskilled, simple, routine work at all exertional levels.  Spiva disagrees with this assessment and argues that his three psychiatric hospitalizations demonstrate mental limitations

-13-

severe enough to prevent him from performing the mental activities required by competitive employment. Social Security Regulation 96-8p states that work-related mental activities generally required for competitive work include the abilities to: understand, carry out, and remember instructions; use judgment in making work-related decisions; respond appropriately to supervision, co-workers and work situations; and deal with changes in a routine work setting. SSR 96-8p, 1996 SSR LEXIS 5. However, the ALJ's determination is not erroneous simply because Spiva had been previously hospitalized. Nowhere in the medical records or evaluations does any treater opine that Spiva is unable to work. In contrast, Dr. Johnson stated that Spiva "would be able to maintain steady, gainful employment" if he continued treatment and medication. (Tr. 140A). Further, Dr. Osborn found Spiva's memory, simple math, concentration and judgment to be "adequate" and deemed Spiva capable of performing routine tasks, interacting with co-workers and maintaining concentration and attention. (Tr. 145-46). Hinson also determined that Spiva could appropriately interact and adapt to a work setting and that he had no significant limitations in understanding, carrying out instructions, or maintaining concentration and attention. (Tr. 150). Finally, Spiva was responsive to treatment given during his hospitalizations and was discharged each time with an improved condition. (Tr. 206, 213, 284).

Spiva also argues that the RFC determination was not supported by substantial evidence because it did not include the results of his December 2007

-14-

evaluation by Dr. O'Brien, which was conducted after Spiva's hearing before the ALJ. Spiva suggests that the report "could very well have caused the ALJ to differently evaluate" his disability. (Pl.'s Br., at 13). To consider evidence submitted to the Appeals Council but not to the ALJ, as is the case here, a claimant can request a remand of the case to the Social Security Administration for reconsideration based on sentence six of 42 U.S.C. § 405(g). *Eads v. Secretary of Health and Human Services.*, 983 F.2d 815, 817-18 (7th Cir. 1993). Spiva has not made such a request. Instead, Spiva argues that the ALJ committed error by not pro-actively obtaining the evaluation report from either Spiva or Dr. O'Brien after being advised that such an evaluation would take place. However, Spiva fails to explain why consideration of the report would require a different RFC assessment. Dr. O'Brien's report concluded that Spiva had intellectual functioning in the average range and recommends that he receive Division of Vocational Rehabilitation (DVR) assistance and job placement services. (Tr. 14, 19). Though Dr. O'Brien does briefly state that Spiva "is disabled," his report suggests that Spiva is able to work. Dr. O'Brien gives Spiva a moderate rehabilitation prognosis, notes that Spiva is likely to benefit from DVR assistance, and recommends Spiva for job placement services. (Tr. 18-19). These recommendations are inconsistent with a belief that Spiva cannot maintain employment.

A reviewing court only remands a case for consideration of additional evidence when the claimant makes a showing of new evidence that is material and a showing

-15-

Case 2:09-cv-00178-JPS   Filed 03/03/10   Page 15 of 18   Document 17

of good cause for failure to incorporate the evidence into the record. *Schmidt v. Barnhart*, 395 F.3d 737, 742 (7th Cir. 2005). New evidence is only material if there is a "reasonable probability that the ALJ would have reached a different conclusion" had she considered it. *Id*. Here, there is no reasonable probability that the ALJ would have revised Spiva's RFC if she had considered Dr. O'Brien's report. As noted, the report found that Spiva would benefit from job training and placement services, suggesting that Spiva is capable of maintaining gainful employment. If Spiva was so functionally limited or "disabled" that he could not work, then a recommendation that DVR provide Spiva with "necessary" job skills training would be wasteful and illogical. The court cannot find that the ALJ committed reversible error by not considering immaterial, post-hearing evidence that Spiva never attempted to provide to the ALJ.

### III.     Step Four Determination

Spiva also argues that the ALJ improperly concluded that he could perform his past relevant work as a stocker at step four of the five-step sequential test for determining whether a claimant is disabled. The Social Security regulations create a five-step test for evaluating disability and require the ALJ to determine at step four whether a claimant's impairments limit his RFC so that he is no longer able to perform the duties of his former employment. *See Wolfe v. Shalala*, 997 F.2d 321, 322-23 (7th Cir. 1993). A claimant will be deemed "not disabled" at step four if he retains the RFC to perform either: 1) the actual demands and job duties of a

-16-

particular past relevant job; or 2) the functional demands and job duties of the occupation as generally required by employers. *Id.* at 323. The ALJ here found that Spiva was not disabled under the Social Security Act because he was capable of performing his past relevant work as a stocker, as actually and generally performed. (Tr. 35).

An ALJ may draw reasonable inferences about the mental demands and job requirements of particular work, as Spiva himself acknowledges. Further, an ALJ may rely solely on a claimant's testimony regarding his previous job in determining the demands of that position. Social Security Ruling 82-62 states that the claimant is the "primary source for vocational documentation" and that his statements "regarding past work are generally sufficient for determining the skill level, exertional demands and nonexertional demands of such work." SSR 82-62, 1982 SSR LEXIS 27. Spiva provided testimony to the ALJ that his stocker work at Walmart involved stocking shelves and loading trucks. (Tr. 293-295). From this, the ALJ could reasonably infer that a person with an RFC to perform unskilled, simple, routine work is capable of this employment as a stocker. The court previously found that the ALJ's determination that Spiva can perform unskilled, simple, routine work is supported by substantial evidence. Therefore, the ALJ could permissibly conclude that Spiva is capable of stocking work, despite his limitations. Further, the ALJ found that Spiva was "not disabled" in light of Medical-Vocational Rule 204.00, given his age, education, work experience, and RFC; a finding which Spiva does not

-17-

Case 2:09-cv-00178-JPS   Filed 03/03/10   Page 17 of 18   Document 17

challenge. (Tr. 35). The ALJ's step four determination is supported by substantial evidence and the court declines to remand the case on this basis.

Accordingly,

**IT IS ORDERED** that the decision of the Commissioner denying the plaintiff's application for disability insurance benefits and supplemental security income be and the same is hereby **AFFIRMED**;

**IT IS FURTHER ORDERED** that this case be and the same is hereby **DISMISSED**.

The clerk of court is ordered to enter judgment accordingly.

Dated at Milwaukee, Wisconsin, this 3rd day of March, 2010.

BY THE COURT:

J.P. Stadtmueller
U.S. District Judge